No. 57,079

CHESTER R. ELKINS, *Claimant/Appellee*, v. SHOWCASE, INC., d/b/a LOFT STEAK HOUSE and SHOWCASE THEATRE, *Respondent/Appellant*.

(704 P.2d 977)

Opinion filed July 26, 1985.

*K. Gary Sebelius*, of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause, and *Catherine A. Walter*, of the same firm, was with him on the briefs for appellant.

*Karl V. Cozad*, staff counsel, Kansas Department of Human Resources, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an appeal in an administrative proceeding brought by an employee, pursuant to the Kansas Wage Payment Act (KWPA), K.S.A. 44-313 *et seq.*, seeking recovery of back wages. The claimant is Chester L. Elkins, a former waiter at the Loft Steak House. The respondent-employer is Showcase, Inc., d/b/a Loft Steak House and Showcase Theatre in Topeka. An

administrative hearing officer of the Kansas Department of Human Resources awarded claimant back wages and an equal amount as a statutory penalty pursuant to K.S.A. 44-315(b). Showcase, Inc. appealed to the district court, which affirmed the order of the department. Showcase then appealed to the appellate courts.

The facts in the case were not greatly in dispute and were found by the administrative hearing officer to be essentially as follows:

1. Chester R. Elkins, the claimant, was employed by Showcase Inc., d/b/a Loft Steak House and Showcase Theatre, 417 W. 37th, Topeka, Kansas, the respondent, as a waiter from September 16, 1980, until March 29, 1981, when claimant was fired.

2. Claimant was employed under an employment agreement which provided a cash wage payment of two dollars and one cent ($2.01) per hour with respondent claiming full legal tip credit of one dollar and thirty-four cents ($1.34) per hour. In addition, respondent had in place a tip pooling system whereby respondent would deduct from claimant's daily tips an amount equal to six percent (6%) of the gross dollar volume produced through claimant's employment each day as reflected by guest checks.

3. The tip pool system was in place at the time of claimant's employment and claimant contributed to the pool during his entire employment, yet respondent only maintained records for the period February 16, 1981, to March 29, 1981.

4. Respondent's records in evidence indicate that claimant would report tips received at the end of his shift, and respondent would compute the six percent (6%) gross guest tickets and deduct that amount from reported tips leaving the balance as earned wages of claimant. Further, respondent would make cash payment to claimant for tips on credit sales using the same procedure.

5. Respondent's records report only the last twenty-four (24) days of actual work of claimant, but do not reflect claimant's employment from September 16, 1980, through February 15, 1981. Such employer records do not reflect hours worked by claimant or tips reported, pooled and paid during that period. As respondent is covered by the Fair Labor Standards Act (FLSA), a duty of law exists to maintain required payroll records. Respon-

dent's requirements to keep records includes a method of accurate tip reporting.

6. During the period from February 16, 1981, through March 29, 1981, claimant produced gross sales, reported tips, retained tips and had tip pool deductions as follows:

| DATE | SALES | REPORTED TIPS | 6% SALES | TIPS RETAINED |
|---|---|---|---|---|
| 2-16-81 | $    312.19 | $ 28.00 | $ 18.00 | $ 10.00 |
| 2-18-81 | 415.34 | 34.00 | 24.00 | 10.00 |
| 2-19-81 | 591.19 | 45.00 | 35.00 | 10.00 |
| 2-21-81 | 681.90 | 49.00 | 39.00 | 10.00 |
| 2-22-81 | 262.87 | 25.00 | 15.00 | 10.00 |
| 2-23-81 | 513.09 | 37.00 | 25.00 | 12.00 |
| 2-24-81 | 425.15 | 38.00 | 28.00 | 10.00 |
| 2-26-81 | 345.37 | 27.00 | 17.00 | 10.00 |
| 2-27-81 | 778.40 | 43.00 | 32.00 | 11.00 |
| 2-28-81 | 830.32 | 49.00 | 39.00 | 10.00 |
| 3-08-81 | 405.12 | 34.00 | 24.00 | 10.00 |
| 3-10-81 | 413.78 | 36.00 | 26.00 | 10.00 |
| 3-11-81 | 579.16 | 44.00 | 34.00 | 10.00 |
| 3-13-81 | 570.21 | 43.00 | 28.00 | 15.00 |
| 3-14-81 | 887.49 | 54.00 | 39.00 | 15.00 |
| 3-16-81 | 235.81 | 24.00 | 14.00 | 10.00 |
| 3-17-81 | 287.09 | 27.00 | 17.00 | 10.00 |
| 3-19-81 | 577.63 | 44.00 | 34.00 | 10.00 |
| 3-21-81 | 778.53 | 49.00 | 39.00 | 10.00 |
| 3-22-81 | 307.92 | 28.00 | 18.00 | 10.00 |
| 3-25-81 | 488.39 | 39.00 | 29.00 | 10.00 |
| 3-27-81 | 497.34 | 39.00 | 24.00 | 15.00 |
| 3-28-81 | 624.82 | 52.00 | 37.00 | 15.00 |
| 3-29-81 | 595.35 | 45.00 | 35.00 | 10.00 |
| TOTALS (24 days) | $12,404.45 | $933.00 | $670.00 | $263.00 |
| Daily Average | $    516.85 | $ 38.88 | $ 27.92 | $ 10.96 |

These figures indicate that claimant only retained twenty-eight percent (28%) of his reported tips and the six percent (6%) gross sales deduction amounted to seventy-two percent (72%) pooling of reported tips.

7. While the records do not reflect the number of days claimant worked during the period September 16, 1980, through February 15, 1981, the reasonable projection can be made that claimant would have performed in a manner not unlike the average of the twenty-four (24) days worked for which records are available.

8. Respondent's managers testified that claimant had not given

a written authorization for deduction of the six percent (6%) of gross sales from his wages. Further, if such deductions were to exist, they could not be considered to accrue to the benefit of the claimant.

9. Respondent's system of deduction for tip pooling does not conform to requirements of the FLSA, which places a generally acceptable limit of fifteen percent (15%) of reported tips as the maximum amount an employer may divert into a tip pool. Additionally, payment out of that pool to nontipped employees would invalidate the pool. In the instant case the bartenders, who are paid forty percent (40%) of the pool, are considered nonservice bartenders, as they perform their functions away from the customers much the same as a cook who is clearly nontipped. Respondent additionally takes tip credit for such bartenders as part payment of the required minimum wage of three dollars and thirty-five cents ($3.35) per hour.

10. Clearly respondent, by design, intent and purpose, has caused to be put in place the tip pooling system based on gross sales as a replacement for a tip pool system through which forty percent (40%) of reported tips were pooled. The stated reason is that the employees would not report all tips. Under the standards discussed in Findings of Fact #9, a question would exist if such previous system would qualify under the FLSA. Accordingly, respondent is found to be a willful violator as provided in K.S.A. 44-315 (b).

11. The tip pooling system at issue here is designed to provide tips to other employees who assist in the food service area. However, testimony indicates that not all moneys pooled were in fact paid out to such employees, eligible or not. Respondent provides no evidence that any of the moneys pooled by such system are paid out and not retained by the employer.

A question exists that this system may be designed to circumvent provisions of the FLSA and the KWPA.

12. Claimant was employed during the period respondent failed to maintain records and, using the evidence of the period for which records were maintained, it is determinable through estimate to reasonably find claimant was employed at least sixteen days per month for five-to-six hours per day during the five-month period of September 16, 1980, until February 15, 1981, when records were maintained. Further, during such

period in which employer records were maintained, claimant's services produced an average daily gross sales of five hundred sixteen dollars and eighty-five cents ($516.85). Claimant reported an average daily tip of thirty-eight dollars and eighty-eight cents ($38.88), having an average daily six percent (6%) deduction of twenty-seven dollars and ninety-two cents ($27.92), while retaining a daily average tip of ten dollars and ninety-six cents ($10.96). In view of such daily averages, a reasonable estimate of amounts deducted is made for that period of no records as follows:

5 months X 16 days X $27.92 (6% deduction) = $2233.60.

13. A total of six percent (6%) deductions in the amount of twenty-nine hundred three dollars and sixty cents ($2903.60) have been made from claimant's reported tips under the respondent's tip pooling system and is based on actual records for the period February 16, 1981, through March 29, 1981, and estimates for the period September 16, 1980, through February 15, 1981, as set out herein.

The administrative hearing officer concluded that respondent Showcase had violated the provisions of K.S.A. 44-319, which provides as follows:

"44-319. **Withholding of wages.** (a) No employer may withhold, deduct or divert any portion of an employee's wages unless: (1) The employer is required or empowered to do so by state or federal law; (2) the deductions are for medical, surgical or hospital care or service, without financial benefit to the employer, and are openly, clearly and in due course recorded in the employer's books; or (3) the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee.

"(b) Nothing in this section shall be construed as prohibiting the withholding of amounts authorized in writing by the employee to be contributed by him to charitable organizations; nor shall this section prohibit deductions by check-off of dues to labor organizations or service fees, where such is not otherwise prohibited by law."

In reaching his decision, the administrative hearing officer adopted the following conclusions of law:

1. K.S.A. 44-315(a) requires that whenever an employer terminates an employee, such employer shall pay the employee's earned wages by the next regular payday on which he or she would have been paid if still employed.

2. K.S.A. 44-315(b) provides that when an employer fails to pay an employee his earned wages as required by K.S.A. 44-314 or K.S.A. 44-315(a), such employer shall be liable therefor and shall

additionally be liable for damages in the amount of one percent (1%) per day except Sundays or legal holidays, for each day the failure to pay continues after the eighth day after such wage is due, or in an amount equal to the wages owing, whichever is smaller.

3. K.S.A. 44-319(a)(3) provides that no employer may deduct, withhold or divert any portion of an employee's wages unless the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee.

4. K.S.A. 44-313(c) provides that "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, place, commission or other basis less authorized withholding and deductions.

5. K.A.R. 49-20-1(F) (1978) (now K.A.R. 49-20-1[d] [1984]), defines "or other basis," within the meaning of K.S.A. 44-313(c), as all agreed compensation for services including, but not limited to, profit sharing and fringe benefits for which the conditions required for earning have been met, and any condition or policy causing forfeiture or loss of such earned wage is ineffective and unenforceable.

6. The Fair Labor Standards Act, 29 U.S.C. § 203(m) (1982), defines "wage" to include tips as wages as follows:

"In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 40 per centum of the applicable minimum wage rate, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee. The previous sentence shall not apply with respect to any tipped employee unless (1) such employee has been informed by the employer of the provisions of this subsection, and (2) all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."

7. The Fair Labor Standards Act, 29 U.S.C. § 211(c) (1982), provides:

"Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder."

The administrative hearing officer ordered Showcase, Inc. to pay the claimant $2,903.60 in wages and an equal amount as damages as provided by K.S.A. 44-315(b).

The respondent Showcase appealed to the district court which, after a hearing, affirmed the decision of the hearing officer. The respondent appeals from the decision of the district court raising four basic issues on the appeal.

As its first point, the respondent challenges the jurisdiction of the state administrative hearing officer to determine violations of the FLSA, 29 U.S.C. § 216(b) (1982), which provides civil liabilities for violations of the act, stating that an aggrieved claimant may maintain an action in a federal or state court of competent jurisdiction. Respondent argues that a state administrative agency simply does not have jurisdiction to hear cases where there is a claimed violation of the FLSA. The claimant contends that this administrative proceeding was not brought under the FLSA but was brought under the provisions of the Kansas Wage Payment Act, K.S.A. 44-313 *et seq.*, for enforcement of his rights under *state law.* In determining this case, the administrative hearing officer was required to determine whether the claimant's wages had been wrongfully withheld under K.S.A. 44-319, which provides, in substance, that no employer may withhold, deduct, or divert any portion of an employee's wages unless the employer is required or empowered to do so *by state or federal law.* Hence, the provisions of the FLSA were to be considered only to determine whether Showcase was empowered to withhold wages under that federal statute.

We agree with the trial court that the Kansas Department of Human Resources had jurisdiction under the provisions of the KWPA to determine whether claimant's wages had wrongfully been withheld by the respondent. This is a not a preemption case, because it is not a case of federal law overriding a state law. The action is brought for the purpose of enforcing claimant's rights under the Kansas law, and the provisions of the FLSA are material only if an issue arises whether an employer is empowered by that act to withhold any portion of an employee's wages. The administrative regulations adopted by the Wage and Hour Division of the United States Department of Labor and several cases which have ruled on this issue hold clearly that the

FLSA does not override or nullify nonconflicting state and local legislation passed for the purpose of protecting wage earners and to insure payment of their wages. A regulation of the federal Wage and Hour Division, which is set forth in 29 C.F.R. § 531.26 (1984), recognizes that various federal, state, and local legislation govern the calculation of wages and the manner by which they shall be paid. The regulation then states specifically:

"Where such legislation is applicable and does not contravene the requirements of the Act, nothing in the Act, the regulations, or the interpretations announced by the Administrator should be taken to override or nullify the provisions of these laws."

In *Butte M. Union v. Anaconda C. Min. Co.*, 112 Mont. 418, 431, 118 P.2d 148 (1941), it was held that, upon the exercise of federal jurisdiction over the hours of labor in underground metal mines under the FLSA, the federal act supersedes the state jurisdiction to the extent of any *inconsistency*, but, *where not inconsistent*, the state and federal provisions jointly govern. The same principle of law is recognized in *Doctors Hospital, Inc. v. Silva-Recio*, 429 F. Supp. 560 (D.P.R. 1975), which concerned the validity of certain regulations of the Minimum Wage Board of Puerto Rico establishing higher minimum wages than were set by the FLSA. The court held that federal law supersedes a state law when state law is in conflict with federal law; however, conflict between the two laws must be positive and direct in order to make coexistence of two laws an impossibility. Unless there is a specific prohibition in federal law, state law which complements federal law is valid. To determine whether state law is in conflict with federal law which regulates the same field, it is necessary that the state law in its application contravene federal public policy or cause different results or consequences. The court found no reason why the state regulations could not be enforced since they were not in conflict with the federal law. See also *Maldonado v. International Business Machines Corp.*, 56 F.R.D. 452 (D.P.R. 1972), which held that where a state law is more beneficial to an employee than the FLSA, state law must apply. For more recent cases to the same effect, see *Davis v. Jobs for Progress, Inc.*, 427 F.Supp. 479, 483 (D. Ariz. 1976); and *Webster v. Bechtel*, 621 P.2d 890 (Alaska 1980).

This court recently addressed the preemption doctrine in a labor dispute involving the KWPA. In *Whelan's Inc. v. Kansas*

*Dept. of Human Resources,* 235 Kan. 425, 681 P.2d 621 (1984), it was held that the preemption doctrine is not to be applied in a manner which "sweeps away state-court jurisdiction." The court held that a wage issue peripheral to an unfair labor practice issue is not preempted by the National Labor Relations Board's (NLRB) resolution of the labor issue. The two issues are distinct and therefore separate from each other. The unfair labor practice issue was held to be a federal issue and preempted by the NLRA, and the wage issue was a state issue over which the NLRB had no jurisdiction.

We hold that an administrative hearing officer of the Kansas Department of Human Resources has jurisdiction to determine violations of the KWPA, K.S.A. 44-313 *et seq.,* and that the Kansas statutes on the subject of wage payments are enforceable so long as they are not in conflict with or contrary to the provisions of the federal FLSA.

As its second point on the appeal, Showcase maintains that it was denied procedural due process of law because, prior to the time of the administrative hearing, it had no notice the claim for wages would involve the FLSA, which had to be considered in order to determine if there had been a violation of the KWPA. Further, it complains because the notice of claim referred to specific sections of the KWPA but did not refer to any provisions of the FLSA. It has been held that the essential elements of due process are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case. *Schulze v. Board of Education,* 221 Kan. 351, 559 P.2d 367 (1977); *Rydd v. State Board of Health,* 202 Kan. 721, 451 P.2d 239 (1969).

Under the factual circumstances shown in this case, we have no hesitancy in holding that Showcase was not denied procedural due process in the hearing before the administrative hearing officer of the Department of Human Resources. In this case, the wage claim was not filed or adjudicated as an action under the FLSA. The record shows that a notice of claim was sent to Showcase on or about April 8, 1981. The notice of claim specifically refers to a claimed violation of K.S.A. 44-319 regarding withholding of wages. As previously noted, that section prohibits an employer from withholding wages unless required or empowered to do so by state or federal law. Thus, of necessity, the

respondent was notified that the provisions of federal law would be considered in determining whether the employer was empowered to withhold wages under the circumstances. Furthermore, the wage claim specifically sets forth a wage dispute involving the Showcase tip pooling arrangement. The basic issue to be determined in the case was whether the tip pooling was valid or invalid. It is clear that the notice claim was drafted with reasonable and sufficient certainty to advise respondent of the matters charged and the relief sought in the administrative proceeding. Thus, we hold that the respondent was not denied procedural due process of law.

The third point raised by Showcase on the appeal is that it was denied its right to a jury trial concerning violations of the FLSA. The claimant contends that his claim for withheld wages was administratively adjudicated pursuant to the KWPA and that Showcase had no right to a jury trial, because the action was not brought under the FLSA. As a general rule, the cases hold that the common-law right to a jury trial under federal or state constitutional provisions does not apply in the case of a statutory action or proceeding not in the nature of a suit at common law, 47 Am. Jur. 2d, Jury § 41, p. 658. We do not deem it necessary, however, to determine that issue in this case. The evidentiary record in this case discloses that there was no relevant factual dispute either at the administrative level or in district court. The basic dispute in this case was the validity of the tip pooling arrangement. All of the evidence as to tip pooling came from Showcase employees who took the stand before the administrative hearing officer. The issues presented for determination in both the district court and in this court on appeal essentially involve questions of law.

We further note that at no time in the administrative hearing or prior to the decision of the district court on the merits did Showcase assert the claim that it was entitled to a jury trial. This court has held previously that the right to a jury trial only arises where there are disputed fact issues. Furthermore, conduct or acquiescence inconsistent with an intention to insist on a jury trial may constitute a waiver thereof. *Westamerica Securities, Inc. v. Cornelius,* 214 Kan. 301, 306, 520 P.2d 1262 (1974). We hold this point to be without merit.

The fourth point raised on the appeal is that the administrative

hearing officer's findings of fact were arbitrary, capricious, and not substantially supported by the evidence. The rule is well established that neither a district court nor the Supreme Court on appeal may substitute its judgment for that of an administrative board. *Weinzirl v. The Wells Group, Inc.,* 234 Kan. 1016, 677 P.2d 1004 (1984). On appeal from an administrative decision, the Supreme Court is restricted to considering whether, as a matter of law, the administrative agency acted fraudulently, arbitrarily, or capriciously. An appellate court may consider whether the administrative order is substantially supported by the evidence and whether the agency's action was within the scope of its authority. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment,* 234 Kan. 374, 381-86, 673 P.2d 1126 (1983).

Under this point, the first issue raised by Showcase is whether there was sufficient evidence to support the findings of the administrative hearing officer that the amounts withheld by the tip pool were wages within the meaning of K.S.A. 44-313. In its memorandum opinion, the district court held that the amounts paid to the Showcase tip pool were "wages" within the meaning of K.S.A. 44-313, reasoning as follows:

"Respondent argues that the hearing officer erred in determining the amounts paid into the tip pool were 'wages' within the meaning of K.S.A. 44-313. That section provides:

" 'Wages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission *or other basis* less authorized withholding and deductions.'

"K.A.R. 49-20-1(F) elaborates on the meaning of 'or other basis',

" 'Or other basis', within the meaning of K.S.A. 44-313(c) shall include all agreed compensation for services including, but not limited to, profit sharing and fringe benefits for which the conditions required for entitlement, eligibility, accrual or earning have been met by the employee. Conditions subsequent to such entitlement, eligibility, accrual or earning resulting in a forfeiture or loss of such earned wage shall be ineffective and unenforceable.'

"It is clear that 'wages' within the meaning of K.S.A. 44-313 encompasses a broad scope. The hearing officer did not err when he concluded that tips for services performed are 'wages' within the meaning of K.S.A. 44-313. The conclusion of the hearing officer was correct that '. . . customers, not the employer, have made the additional payment of a fringe benefit to the employee of the employer for receiving a standard of service.' (Order p. 6)

"The respondent argues that wages are not deemed to be earned until the employee has fulfilled all of his obligations under the employment agreement. Respondent argues that the claimant knew of the tip pooling arrangement when he was hired and further that this tip pool was a condition precedent to the receipt of any amounts due to the plaintiff. Respondent asserts that claimant had

no right to any compensation from the tip pool until it was paid out according to the terms of the employment contract. This argument is without merit.

"The respondent took advantage of the tip credit allowed under the Fair Labor Standards Act to meet its minimum wage obligation. 29 U.S.C. § 203(m) provides that for an employer to take advantage of tips being included within the calculation of the minimum wage rate, the tips must be retained by the employee or pooled among employees who customarily and regularly receive tips. Respondent's argument that the employee had no right to compensation from the tip pool until it was paid out is clearly contrary within the meaning of the above section. Further, under Kansas law as expressed by the court in *Sweet v. Stormont-Vail Regional Medical Center*, 231 Kan. 604 (1982), an employment contract will control the rights of the parties unless it is contrary to law or unreasonable in its terms."

We have concluded that this issue was correctly decided by the administrative hearing officer and by the district court. 29 U.S.C. § 203(m) (1982) clearly contemplates that tips received by a tipped employee of an amount not in excess of 40% of the applicable minimum wage may be considered in determining wages. In the present case, it is undisputed that the Showcase tip pool was set up and Showcase took advantage of the tip credit allowed under K.S.A. 44-313 to meet its minimum wage obligation. We hold that the evidence was sufficient to support the finding that the amounts withheld for the tip pool were wages within the meaning of K.S.A. 44-313.

The final points challenge the sufficiency of the evidence to support certain findings of the administrative hearing officer pertaining to the validity of the tip pooling arrangement. These points are as follows:

(1) Whether the administrative hearing officer's finding that a 6% gross sales contribution to the tip pool amounted to a 72% pooling of reported tips is supported by the evidence.

(2) Whether the administrative hearing officer's finding that certain bartenders were ineligible to participate in the tip pool was supported by the evidence.

To fully understand the implications of these issues a general review of the FLSA would be helpful.

The purpose and policy of the Fair Labor Standards Act is set forth at 29 U.S.C. § 202 (1982) as follows:

"§ 202. Congressional finding and declaration of policy

"(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency,

and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce.

"(b) It is hereby declared to be the policy of this chapter through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

The expressed congressional purpose in passing the FLSA was to enable a substantial part of the American work force to maintain a minimum standard of living. *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir. 1974). The FLSA was designed to provide a minimum standard of living necessary for the health, efficiency and the general well-being of workers as well as to prescribe certain minimum standards for working conditions. *Brennan v. Wilson Building, Inc.*, 478 F.2d 1090, 1094 (5th Cir.), cert. denied 414 U.S. 855 (1973).

The FLSA effectuates its purpose by requiring payment of a minimum wage and by limiting or shortening work hours or requiring increased pay for overtime, thus spreading available work among a greater number of workers. *McComb v. Sterling Ice & Cold Storage Co.*, 165 F.2d 265, 267-68 (10th Cir. 1947); *Ille v. Travis Oil Corporation*, 196 Okla. 332, 164 P.2d 998 (1945); *Overnight Motor Co. v. Missel*, 316 U.S. 572, 577, 86 L.Ed. 1682, 62 S.Ct. 1216, *reh. denied* 317 U.S. 706 (1942).

In the definition of "wage," the FLSA allows an employer to take a tip credit of up to 40% of the employee's minimum wage rate subject to certain conditions. 29 U.S.C. § 203(m) (1982) provides:

"In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 40 per centum of the applicable minimum wage rate, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee. The previous sentence shall not apply with respect to any tipped employee unless (1) such employee has been informed by the employer of the provisions of this subsection, and *(2) all tips received by such employee have been retained by the employee, except that this subsection shall*

*not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."* (Emphasis supplied.)

Thus, 29 U.S.C. § 203(m) allows tips to be included in calculating 40% of the minimum wage rate paid to a tipped employee provided (1) the employer informs the employee of the provisions of 29 U.S.C. § 203(m); and (2) all tips received by the employee are retained by the employee, except the tip credit provision does not prohibit pooling of tips among employees who customarily and regularly receive tips.

Under the 1974 amendments to the FLSA, any agreement between a tipped employee and an employer in which any part of the tips received by the employee become property of the employer is invalid, as those amendments require an employee to retain all tips. 5 Empl. Coord. (RIA) ¶ C-14,112 (1985). Tips are not wages except to the extent an employer, under certain circumstances, counts them as wages up to 40% of the required minimum wage. Regardless of whether an employer elects to take a statutory tip credit, all tips received by the employee are the employee's property and the employee must be allowed to retain them. 5 Empl. Coord. ¶ C-14,112. However, tipped employees may be required to participate in a valid tip pooling arrangement. Wage and Hour Field Operations Handbook § 30d04(a) (1979). A valid tip pooling arrangement includes only employees who customarily and regularly participate in tip pooling arrangements and cannot require waiters and waitresses to contribute a greater percentage of their tips than is *customary and reasonable.* Wage and Hour Field Operations Handbook § 30d04(b); Wage and Hour Publication 1433 (1979). For enforcement purposes, the Wage-Hour Administrator has established 15% of a waiter's tips as the usual standard for what is customary and reasonable, subject to a showing that a greater percentage would be appropriate in a particular case. A percentage of a waiter's tips substantially in excess of the 15% standard would ordinarily violate the "customary and reasonable" requirement, unless positive evidence was presented that the amount contributed was customary and reasonable.

Generally, administrative interpretations of the Fair Labor Standards Act, though not binding on the court, are persuasive. *Sykes v. Lochmann,* 156 Kan. 223, 228, 132 P.2d 620, *cert. denied* 319 U.S. 753 (1943); *Bush v. Wilson & Co.,* 157 Kan. 82, 89, 138

P.2d 457 (1943); *Jackson v. Derby Oil Co.*, 157 Kan. 53, 63, 139 P.2d 146 (1943).

The district court, in affirming the administrative hearing officer, stated:

"B. TIP POOLING ARRANGEMENT IN VIOLATION OF FAIR LABOR STANDARDS ACT.

"The hearing officer concluded that the Fair Labor Standards Act placed a general acceptable limit of fifteen percent of reported tips as the maximum amount an employer may divert into a tip pool. The hearing officer found violations of the Fair Labor Standards Act in two respects. First, the percentage of tips diverted into the pool exceeded the acceptable limit of fifteen percent and second, payments from the pool were made to non-tipped employees. Respondent argues that the Fair Labor Standards Act does not place a limit on the amount an employer may divert into a tip pool and further argues that the record does not illustrate substantial evidence to warrant a finding that the bartenders could not validly participate in the tip pool.

"The Fair Labor Standards Act, 29 U.S.C. 201 et seq. does not specify the maximum amount of tips which may be diverted into a tip pool. However, *Opinion WH-468* addresses this issue. The opinion states that contributions to a tip pool not exceeding fifteen percent of an employee's tips are generally not questioned. The same applies where a percentage of sales deduction does not exceed fifteen percent of the tips actually received by the employee. In this case, the hearing officer found the gross sale deduction to amount to seventy-two percent of reported tips. Seventy-two percent is so far in excess of the fifteen percent suggested limit that the hearing officer cannot be said to be in error in concluding this to be a violation of the Fair Labor Standards Act."

On appeal, respondent does not contest the law applied by the administrative hearing officer or the district court. Rather, respondent contends the finding that a 6% gross sales contribution to a tip pool amounted to a 72% pooling of claimant's reported tips was not supported by the evidence.

Based upon the evidentiary record, we find the holding of the administrative hearing officer that the 6% gross sales deduction amounted to 72% of reported tips was supported by substantial competent evidence. It must be noted that the respondent had a duty under the FLSA to maintain adequate payroll records to reflect the hours worked by the claimant and tips reportedly paid during that period. The respondent offered records covering only the last 24 days of claimant's employment and did not reflect the claimant's employment records from September 16, 1980, through February 15, 1981. Because the respondent was required by law to keep adequate records and failed to do so, we cannot say that the administrative hearing officer committed

error in making a projection pertaining to the percentage of tips retained. If the respondent had additional records, it could have made them available either at the original hearing or on a motion for rehearing, if it believed the records would clarify the facts or shed light on that issue.

Finally, Showcase contends the administrative hearing officer's finding that the bartenders in this case were ineligible to participate in the tip pool was not supported by the evidence. The issue is whether the bartenders in this case were tipped employees who customarily and regularly received tips within the meaning of 29 U.S.C. § 203(m)(2).

The evidence in this regard was undisputed and was based primarily upon the testimony of Showcase employees. Some of the bartenders were located behind a wall so they did not have any contact with customers and were not in a position to receive tips. Thus, the bartenders made no contributions to the tip pool. The record further reflects that 40% of the moneys received in the tip pool was divided among the bartenders. The district court relied on Opinion WH-468 from the Wage-Hour Administrator which states without equivocation:

"We also point out that only employees who customarily and regularly receive tips, *i.e.*, waiters, bellhops, waitresses, countermen who serve customers, busboys and service bartenders, may be included in a valid tip pool. The inclusion of employees who do not customarily and regularly receive tips, *i.e.*, janitors, dishwashers, chefs and laundry room attendants, would invalidate a tip pool. *(Opinion WH-468, signed by Wage-Hour Administrator Xavier M. Vela, September 5, 1978.)*"

The district court correctly noted that the administrative hearing officer had determined that the bartenders at respondent's place of business were "nonservice" bartenders, because their functions are performed away from the customers similar to that of a nontipped cook. The testimony showed that employees who do not customarily and regularly receive tips received 40% of all tips from the pool. Therefore, 40% of the tip pool went to employees who *do not* customarily and regularly receive tips. This violates the Fair Labor Standards Act, 29 U.S.C. § 203(m)(2), and invalidates the tip pool as to that percent paid ineligible employees. The administrative hearing officer and the district court did not err in so finding.

In closing, it should be observed that the regulations adopted by the Wage-Hour Administrator are somewhat confusing and

difficult to understand. The problems of Showcase in this case would probably not have arisen if Showcase had entered into written contracts with its employees covering the tip pooling arrangement. Furthermore, Showcase failed to keep the records required by the FLSA. Likewise, a ruling from the administrator could have determined the validity or invalidity of the tip pooling in advance and avoided this litigation. On the basis of the record before us, we cannot say that the district court erred and its judgment is affirmed.